Filed 5/14/14  City of Dana Point v. Beach Cities Collective CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| CITY OF DANA POINT, | G047839 |
| Plaintiff and Respondent, | (Super. Ct. No. 30-2010-00352103) |
| v. | O P I N I O N |
| BEACH CITIES COLLECTIVE, et al., | |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, Kirk H. Nakamura, Judge.  Affirmed.

Schwartz Law and Jeffrey M. Schwartz for Defendants and Appellants.

Rutan & Tucker, A. Patrick Muñoz, Jennifer Farrell and Alisha Patterson for Plaintiff and Respondent.

\*          \*          \*

David Lambert appeals from the trial court's decision after a bench trial finding the dispensary he operated, Beach Cities Collective (Beach Cities or BCC), did not comply with state medical marijuana law. The trial court therefore sustained the City of Dana Point's (the City's) nuisance petition, enjoined Lambert and BCC from operating the dispensary, and imposed fines and penalties under the nuisance abatement law (Health & Saf. Code, §§ 11570, 11581)[1] and under Business and Professions Code section 17200 for operating an unlawful business.[2]

Lambert contends the trial court erred by drawing an adverse inference from Lambert's repeated invocation of the Fifth Amendment during his deposition and from BCC's similar claim of privilege in response to the City's document discovery requests. Lambert also argues the trial court erred in granting the City's motion to exclude his testimony because he had invoked the Fifth Amendment on certain subjects at his deposition. He further argues the testimony of the City's expert concerning BCC's

---

[1]     All further statutory references are to this code unless noted.

[2]     We grant the City's unopposed request for judicial notice of documentation from the secretary of state reflecting suspension of BCC's corporate status. (Evid. Code, §§ 452, 459.) BCC therefore may not prosecute this appeal (*Grell v. Laci Le Beau Corp.* (1999) 73 Cal.App.4th 1300, 1306), and it proceeds as to Lambert only.

For the reader's convenience, we also note there have been two prior appeals in this matter. In the first, we concluded Malinda Traudt, a BCC member, could not intervene in the City's lawsuit to shut down the dispensary because she did not have individual standing, apart from the dispensary itself, to challenge the City's dispensary ban. (*People ex rel. City of Dana Point v. Beach Cities Collective* (G043831, filed Dec. 21, 2011) [nonpub. opn.] (hereafter *Beach Cities I*).) In the second, we reversed the trial court's summary judgment in favor of the City because there were triable issues of fact on whether BCC complied with state medical marijuana law. (*People ex rel. City of Dana Point v. Beach Cities Collective* (G044971, filed Mar. 29, 2012) [nonpub. opn.] (hereafter *Beach Cities II*).)

expenses, profits, and compliance with state medical marijuana law was "speculative and unsupported," and therefore should have been excluded. Finally, he challenges the dismissal of his cross-complaint, arguing the trial court erred when it found he lacked standing to contest the City's ban against dispensaries. The Supreme Court, however, has now upheld local dispensary bans in *City of Riverside v. Inland Empire Patients Health & Wellness Center, Inc.* (2013) 56 Cal.4th 729 (*Inland Empire*). As we explain, Lambert's contentions on appeal are without merit, and we therefore affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

The City filed its nuisance complaint against Beach Cities in March 2010, alleging four causes of action, all predicated on the dispensary's allegedly illegal marijuana "cultivation, distribution, possession, and sales taking place at" Beach Cities' location. The City's first three causes of action consisted of: (1) abatement under the narcotics abatement legislation (§ 11570) based on Beach Cities' alleged failure to comply with state medical marijuana law; (2) public nuisance (Civ. Code, §§ 3479, 3480) similarly based on lack of compliance with state medical marijuana law; and (3) violation of the City's zoning code, which did not provide for medical marijuana dispensaries and barred as a public nuisance uses not specifically enumerated in the zoning code. The City based its fourth cause of action for unfair business practices (Bus. & Prof. Code, § 17200) on the state and local violations alleged in the first three causes of action.

On its first two causes of actions, the City alleged Beach Cities failed to comply with state medical marijuana law because "the Dispensary is (a) *neither* a collective *nor* a cooperative . . . ; (b) *not* operating as a non-profit entity . . . ; (c) *not* comprised solely of patients and primary caregiver members . . . ; [and] (d) *not*

3

purchasing marijuana from, or selling to, those members . . . ." (Original italics and boldface.) The City also alleged Beach Cities' failings included ignoring "requirements relating to membership applications . . . , record keeping . . . , [and] business licenses, sales tax and sellers permits . . . ." Finally, the City also alleged Beach Cities failed to comply with Corporations Code requirements applicable to entities organized as a consumer cooperative.

During discovery the City focused its attention on establishing whether Beach Cities violated state law by selling marijuana for profit. (See § 11362.765, subd. (a) ["nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana for profit"].) In the City's words, it sought to learn whether defendants "were operating within the parameters of the CUA, the MMPA, and the AG Guidelines, or if instead they are nothing more than an illegal, for profit, business enterprise engaged in illegally 'selling' marijuana." As we noted in *Beach Cities II*, the City's discovery efforts did not go smoothly.

At his deposition, Lambert refused to answer most questions concerning Beach Cities' activities involving marijuana, invoking the Fifth Amendment.[3] For example, according to the City, Lambert declined to answer questions concerning whether (1) Beach Cities sells marijuana products; (2) when it began selling marijuana; (3) the types or strains of marijuana sold; (4) whether Beach Cities receives monetary compensation in exchange for marijuana; (5) whether Beach Cities acquires all of its marijuana from its members; (6) whether Beach Cities tracks the source of its marijuana;

---

[3]    Counsel explained Lambert's and Beach Cities' position at the deposition this way: "Any questions that have to do with any specifics — timelines, money, quantities — my client will assert the Fifth. That has to do with how federal law works, federal sentencing guidelines, all that stuff."

4

(7) whether Beach Cities takes any steps to ensure marijuana is not distributed to nonmembers; (8) the cash value of the marijuana sold by Beach Cities and the price it pays, if any, for marijuana; (9) the cost to grow marijuana it distributes; (10) how it determines a price for marijuana it sells; or (11) the efforts, if any, to learn whether members or suppliers profited by providing marijuana to Beach Cities.

Meanwhile, Lambert *had* answered many questions at his deposition that shed light on the nature of Beach Cities' operation. When asked, "What does Beach Cities Collective do," Lambert responded, "It's a medical — medical cannabis collective." He acknowledged that Beach Cities members visit its location "from time to time to obtain medical marijuana." He testified that of the two types of medical marijuana entities recognized in the A.G. Guidelines, cooperatives and collectives, Beach Cities chose to operate as a collective, not a cooperative. He testified Beach Cities incorporated as a nonprofit mutual benefit corporation with a board of directors, and acknowledged he was a Beach Cities director, officer, and employee. He testified Beach Cities had three employees, including himself.

Lambert testified none of Beach Cities' directors or corporate officers received any compensation or paid incentive for their role in those positions. He testified "the only compensation that is paid out by Beach Cities Collective to officers, directors or employees is paid in the form of compensation to employees." Employees received a "fixed" or "flat" monthly salary. None received "any sort of benefits such as insurance, profit sharing, automobile allowance, or any other benefits."

Lambert testified Beach Cities only provided marijuana to its members. Beach Cities required its members to present a physician's referral for the use of medical marijuana, and before allowing the member to obtain marijuana, Beach Cities verified the

5

validity of each referral by direct telephone or online contact with the referring physician's office.  Beach Cities verified with the doctors' offices the period for which each referral was valid, which was usually one year.  Beach Cities kept a computer database of information that included its members' names and the expiration date of each member's physician referral.  It also required members to present a driver's license on each visit, which Beach Cities scanned with a barcode reader or similar device to access its database and verify the member's current eligibility to receive marijuana.  Beach Cities kept track of all of its members by recording their information in its database, and it did not distribute marijuana to individuals not in the database.

The City scheduled the deposition of Beach Cities' custodian of records but, recognizing the custodian would assert the same Fifth Amendment claims as Lambert, the parties stipulated to forego the deposition pending resolution of their dispute about the validity of the Fifth Amendment claim.

The day after the parties' stipulation, the City moved for summary judgment or, in the alternative, summary adjudication.  The City asserted it was entitled to judgment as a matter of law on its first and second causes of action, nuisance abatement (§ 11570) and public nuisance (Civ. Code, §§ 3479, 3480), because there was no dispute Beach Cities distributed marijuana and Beach Cities "fail[ed] to produce any evidence . . . in support of the[] only possible affirmative defense," i.e., compliance with state medical marijuana law.  The City also asserted Beach Cities' undisputed distribution of marijuana entitled the City to judgment on its third cause of action, public nuisance for violation of its zoning laws.  Specifically, City zoning law impliedly banned dispensaries by not recognizing them as a permitted use.

6

Based on these first three causes of action, the City asserted it was entitled to judgment on its fourth cause of action for unfair business practices, and entitled to a permanent injunction enjoining Beach Cities and Lambert from distributing marijuana at the Beach Cities location or anywhere in the City.

Beach Cities opposed the motion on grounds disputed issues of material fact remained, particularly on whether it complied with state medical marijuana law. The trial court granted the City summary judgment, but on appeal we reversed. (*Beach Cities II*, *supra*.) We explained that while Beach Cities had not introduced much evidence opposing summary judgment, it was "not accurate" to conclude it had introduced none. "A reasonable trier of fact might conclude from [Lambert's] asserted *facts*, if believed, that Beach Cities conducted its marijuana-related activities in compliance with state medical marijuana law. Or the trier of fact might disbelieve Lambert's version of the facts, and on that basis conclude Beach Cities' marijuana distribution was unlawful." (*Id.* at p. 18.) But this was for the trier of fact to decide, not the trial court on summary judgment.

On remand, the matter was assigned to a new trial judge. Before a two-day bench trial began, the court dismissed Lambert's cross-complaint challenging the City's ban on dispensaries because Lambert lacked standing. As we explain more fully below, the trial court granted the City's motion in limine to exclude newly-proffered evidence Lambert sought to introduce, and denied Lambert's motion to exclude the City's expert witness. Following the trial, the court issued a detailed 36-page statement of decision. The court explained "the evidence demonstrated that BCC was not a nonprofit corporation, failed to enforce membership application and verification requirements and did not show that it acquired, possessed and distributed only lawfully cultivated

7

marijuana." Consequently, the court found BCC's activities constituted a nuisance and sustained the City's nuisance petition. The court also imposed fines and penalties on Lambert and Beach Cities consisting of $25,000 for violating the narcotics abatement law (§ 11581) and $297,500, calculated at $500 a day for the 595 days BCC illegally sold marijuana to the public. Lambert now appeals.

II

DISCUSSION

A.      *Evidence Code section 913*

Lambert contends the trial court erred by drawing adverse inferences from his invocation of the Fifth Amendment, effectively punishing him for exercising his civil rights, and thereby violating Evidence Code section 913. That section provides: "If in the instant proceeding or on a prior occasion a privilege is or was exercised not to testify with respect to any matter, or to refuse to disclose or to prevent another from disclosing any matter, neither the presiding officer nor counsel may comment theron, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference thereon as to the credibility of the witness or as to any matter at issue in the proceeding." (Evid. Code, § 913.)

The City argues that "[n]otwitstanding" this clear statutory prohibition, an adverse inference was nevertheless permissible because the Fifth Amendment does not bar it. (See *Baxter v. Palmigiano* (1976) 425 U.S. 308, 318 (*Baxter*) ["the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"].) This is no answer, however, to the broader protection enacted by the Legislature in the Evidence Code. Simply put, Lambert invoked statutory, not constitutional protection, so the City's

8

reliance on *Baxter* is unavailing.  As our Supreme Court observed in *People v. Holloway* (2004) 33 Cal.4th 96, 131, fn. 9 (*Holloway*), federal case law allowing for adverse inferences under the Fifth Amendment "says nothing about whether the *California* law of evidence sanctions such inferences."  (Original italics.)

The City's reliance on *Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876 (*Avant!*) is similarly misplaced.  *Avant!* quoted *Keating v. Office of Thrift Supervision* (9th Cir. 1995) 45 F.3d 322, 326, for the proposition that "'it is even permissible for the trier of fact to draw adverse inferences from the invocation of the Fifth Amendment in a civil proceeding."  (*Avant!*, *supra*, at pp. 885-886.)  But as the *Avant!* court later recognized, "After that decision, the California Supreme Court relied on Evidence Code section 913 in overruling authority allowing adverse inferences to be drawn when the privilege is invoked in a civil proceeding."  (*Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1054, fn. 6, citing *Holloway*, *supra*, 33 Cal.4th 96, 131.)  In *Holloway*, the high court explained that with the enactment of Evidence Code section 913, "'*no* inference may be drawn from an exercise of a privilege either on the issue of credibility or on any other issue . . . .'"  (*Holloway*, at p. 131, italics added.)  Thus, "California law . . . makes no distinction between civil and criminal litigation concerning adverse inferences from a witness's invocation of the privilege against self-incrimination," and such inferences "are forbidden . . . in both types of cases."  (*Ibid.*)

The City's counsel nevertheless repeatedly invited the trial court to draw such inferences.  Counsel argued, for example:  "So you can make negative inferences from the assertion of the Fifth Amendment;" "You [the trial court] asked the question, should you draw any negative inferences?  And the answer is, absolutely yes";and "Yeah, you should draw inferences from the failure to — inferences from the destruction of those

documents, just like you should draw inferences from taking the Fifth Amendment, which was the basis of those documents not being produced."  But we may not presume the trial court blindly repeated counsel's mistake.  (Evid. Code, § 664.)  Nothing in the court's detailed statement of decision suggests it agreed with counsel's erroneous view of Evidence Code section 913.

Lambert cites several exchanges between the trial court and the City's counsel to suggest the trial court drew a prohibited adverse inference from Lambert's invocation of the Fifth Amendment.  But the exchanges are consistent with permissible inferences from testimony by other witnesses, from the dispensary's admitted shredding of evidence, and from Lambert's failure and the dispensary's failure to produce evidence to support their claims their marijuana activities were lawful.

For example, Lambert notes:  "[A]t trial Dana Point argued, 'So you can make negative inferences from the assertion of the Fifth Amendment.  And certainly one negative inference you can make in this case, *based on Sergeant Lambi's testimony*, is that it is a common practice [for dispensaries] to purchase marijuana from vendors'" (italics added), instead of growing it themselves, as required by California medical marijuana law.  Lambert asserts "that is exactly what the trial court did," drawing a prohibited negative inference by concluding in its statement of decision that "the most convincing evidence presented was by the City to the effect that the marijuana obtained was unlawful marijuana from Northern California."  But as noted in the italicized portion of counsel's statement, the basis for the trial court's conclusion about the origin of BCC's marijuana rested in Lambi's *testimony*, not an adverse inference from Lambert's invocation of the Fifth Amendment in his deposition.

10

Lambert's other attempts to impute to the trial court an adverse inference founded in his Fifth Amendment privilege similarly fail.  As we noted in this case in *Beach Cities I*, the Supreme Court has explained in the criminal context that California medical marijuana law affords only an affirmative defense (*People v. Mower* (2002) 28 Cal.4th 457, 477 (*Mower*)), and we assume the burden to demonstrate facts supporting the defense similarly applies in the civil context here.  (*Beach Cities II*, *supra*, at p. 16.)  Accordingly, Lambert and BCC bore a burden under the rule of "convenience and necessity" (*Mower*, at p. 477) to produce and prove facts supporting the lawfulness of their admitted possession and distribution of marijuana.

Lambert argues the trial court could not infer BCC's marijuana activities were *unlawful* based on BCC's admitted shredding of documents concerning its operations or from Lambert's silence at his deposition on questions pertaining to marijuana.  But even accepting this proposition, it was also true the document shredding and Lambert's silence did nothing to *establish* the lawfulness of BCC's activities.

Lambert in essence attempts to twist the prohibition against drawing adverse inferences from asserting the Fifth Amendment privilege into a theory that the absence of evidence resulting from BCC's document shredding and Lambert's silence at his deposition both constitute evidence BCC acted lawfully.  Not so.  The absence of evidence is indeed evidence of absence.  In other words, wholly absent, so-called "evidence" is no evidence at all.  Accordingly, while counsel for the City urged the trial court to draw negative inferences from Lambert's silence, including a credibility determination that he shredded documents to conceal evidence, we do not assume the trial court's judgment in the City's favor establishes it drew those inferences.  To the contrary, the court instead reasonably could conclude based on other evidence that

11

Lambert and BCC failed to demonstrate their marijuana activities were lawful. In other words, the court found no merit in their affirmative defense.

Thus, Lambert was entitled at his deposition to assert the Fifth Amendment, but his decision *not* to answer virtually all questions concerning marijuana did not somehow furnish evidence that BCC's activities were lawful. The trial court reasonably could determine the questions Lambert did answer and the admissible evidence he did provide, including the declarations and other submissions in opposition to summary judgment, simply did not carry the day in establishing BCC's marijuana activities were lawful. It was for the trial court as the trier of fact to weigh the admitted evidence. We therefore find no merit in Lambert's challenge asserting the trial court drew prohibited inferences.

B.      *Exclusion of Evidence*

Lambert contends the trial court violated due process by barring him from testifying and offering "key witnesses" and evidence in his defense. In particular, he argues the trial court erroneously granted the City's motion in limine at the outset of trial to preclude him from testifying on matters to which he had invoked the Fifth Amendment at his deposition. He also challenges the court's ruling precluding him from introducing documentary evidence he or BCC's custodian of records had refused on Fifth Amendment grounds to produce in discovery. We review the "trial court's decision to admit or exclude evidence . . . for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.)

Relying on our opinion in *People ex rel. City of Dana Point v. Holistic Health* (2013) 213 Cal.App.4th 1016 (*Holistic Health*), Lambert contends the trial court "erred by refusing to permit [him] to testify in his own defense without following the

12

proper procedures . . . ." In *Holistic Health*, we considered a novel scenario in which a trial court denied a city's motion for a protective order that would have barred a dispensary operator from testifying or offering evidence on topics he earlier refused to discuss at his deposition based on his Fifth Amendment privilege. The trial court then inexplicably and summarily excluded the defendant's evidence opposing summary judgment. Specifically, without a hearing and despite denying the protective order, the court granted the city's request under Evidence Code section 352 at summary judgment to strike the operator's declarations and evidence opposing summary judgment, which were directly relevant to key areas in dispute. (*Id.* at p. 1031.) We explained section 352 "furnished no basis to exclude Holistic Health's evidence, and the trial court abused its discretion by effectively granting discovery sanctions without a motion or a hearing on the motion." (*Ibid.*)

Drawing on *A & M Records, Inc. v. Heilman* (1977) 75 Cal.App.3d 554 (*A & M Records*) and *Fuller v. Superior Court* (2001) 87 Cal.App.4th 299 (*Fuller*), we explained those cases "illustrate[] the established procedure that a trial court must consider a protective order or otherwise hold a hearing to evaluate the important interests at stake before excluding testimony or other evidence when a defendant asserts the Fifth Amendment in a civil trial." (*Holistic Health*, *supra*, 213 Cal.App.4th at p. 1031.) Thus, in *A & M Records*, the plaintiff obtained a protective order under which the trial court ordered the recalcitrant defendant "to turn over the requested documents by a specified date before trial, or the defendant would be barred from introducing them at trial, and the court also precluded the defendant "'from testifying at trial respecting matters [and] questions . . . he refused to answer at his deposition[.]'" [Citation.]" (*Holistic Health*, at p. 1031.)

13

Lambert relies on our discussion of *Fuller*, and in particular on suggestions the *Fuller* court made to resolve the important interests that collide when civil plaintiffs seek discovery and defendants invoke the Fifth Amendment because they also may face criminal prosecution. (See *Fuller*, *supra*, 87 Cal.App.4th at p. 307 [noting court's inquiry may show an asserted privilege does not apply, or does not preclude discovery or discovery sanctions]; see also *Pacers, Inc. v. Superior Court* (1984) 162 Cal.App.3d 686, 690 [court must "weigh the parties' competing interests with a view toward accommodating . . . both . . . , if possible"].) Thus, we explained in *Holistic Health* that a trial court "should employ any one of several procedural accommodations the *Fuller* court suggested, or fashion a new one. [Citation.] As pertinent here, for example, when civil defendants invoke the privilege against self-incrimination in pretrial depositions, '[i]nstead of precluding altogether their trial testimony, the trial judge should consider setting a deadline shortly before the trial date for them to announce whether they will be waiving the privilege during the trial. *If they indicate an intent to waive it during the trial, the court should order them to submit to deposition questioning designed to reveal the forthcoming testimony.* If they persist in resisting even this eleventh-hour discovery, the trial judge should preclude them from waiving the privilege at the time of the trial.'" (*Holistic Health*, *supra*, 213 Cal.App.4th at p. 1032, italics added.)

Here, counsel for the City correctly recognized on remand from our reversal of summary judgment that important competing interests were at stake in Lambert's Fifth Amendment invocation and the City's need for discovery to prosecute its nuisance action. Accordingly, the City's counsel sought a continuance to conduct discovery along the lines we later suggested in *Holistic Health*. Specifically, in a hearing addressing the City's continuance request, counsel stated: "If we're going to go to trial

14

and Mr. Schwartz [counsel for Lambert] wants to have these gentlemen testify, let's take their depositions and find out what they're going to say." (See *Holistic Health*, *supra*, 213 Cal.App.4th at p. 1032 [if defendants formerly invoking Fifth Amendment intend to testify at trial "'the court should order them to submit to deposition questioning to reveal the forthcoming testimony'"].)

As an alternative to a continuance, the City's lawyer requested a protective order preventing Lambert from testifying about or introducing documents withheld in discovery on topics to which he or BCC had asserted the Fifth Amendment. At the hearing, counsel for the City highlighted his predicament: "[A]s long as the PMQ [person most qualified] for Beach Cities Collective, which is Mr. Lambert, is not allowed to put on evidence to which he took the 5th Amendment, I am ready to go to trial. As long as also . . . the custodian of records who refused to produce any documents because of the 5th Amendment . . . is not allowed to produce any documents that we don't already have, I am ready to go to trial. [¶] . . . [¶] As long as they're not able to produce documents they refused to produce previously, I am good to go. What I don't want to have happen is we show up on the first day of trial, we have this big fight for three hours over whether [defendants] can testify notwithstanding their prior exercise of the 5th Amendment."

Lambert's attorney steadfastly opposed a continuance, agreeing at the hearing that "if Mr. Lambert took the 5th on something, then he can't testify to it at trial. I have no problem with that. . . . [¶] . . . There is no reason to continue this trial. There is no more discovery game playing. Let's go to trial." The record also discloses that after the hearing, Lambert's lawyer further stipulated that Lambert would "be barred

15

from submitting as evidence documents that were not produced in the earlier depositions."

Based on Lambert's stipulations, the trial court found the City's requests for a continuance or a protective order both moot, subject to the City renewing its request for a protective order at trial if Lambert sought to testify. In an abundance of caution, the City renewed on the first day of trial its request for a protective order, Lambert in turn sought to testify, and the trial court granted the City's motion barring his testimony on topics addressed at his deposition or in the City's document production requests.

Although the City requested and Lambert opposed a continuance for the very purpose discussed in *Holistic Health* — "deposition questioning to reveal the forthcoming testimony" — Lambert now claims on appeal the trial erred by barring him from testifying without following *Holistic Health*'s "proper procedures." Given the procedural history we have described, Lambert's claim has a decidedly hollow ring.

According to Lambert, "The questions [he] sought to answer at trial were distinct from those to which he had invoked his Fifth Amendment rights. Therefore, the trial court erred in refusing to let him testify." The trial court offered to allow Lambert to read his deposition testimony so the court would have an opportunity to assess his credibility as a testifying witness, but Lambert declined. The court also invited Lambert to make an offer of proof concerning his proposed testimony on matters he claimed were not addressed at his deposition or in the City's document requests. Lambert made a lengthy offer of proof on issues he insisted were outside the scope of his deposition or the document requests.

But as the trial court explained in its statement of decision, "[I]t is clear that the breadth and scope of the deposition questions were such that the deposing attorney

16

could be assured that it would be futile to ask any questions regarding the subject area upon which the defendant asserted the Fifth Amendment and that the defendant was asserting his Fifth Amendment [p]rivilege on that area of inquiry. Similarly, the blanket assertion of privilege on the request for production of documents supported the . . . determination to exclude any documents that had not already been produced." The trial court made in its statement of decision a detailed assessment of the document requests and deposition questions that the custodian of records and Lambert refused to answer on Fifth Amendment grounds, including "All Records in your possession, custody and control that evidence your compliance" with California medical marijuana law, and any "General Corporate Documents" pertinent to "whether the entity was formed and operated as a lawful collective in compliance with the CUA, MMPA, and AG Guidelines."

We have reviewed Lambert's offer of proof in light of the questions he refused to answer at his deposition and the documents BCC declined to produce and, with two exceptions, we conclude his offer presented nothing new. But the trial court did not err in excluding the testimony on the two exceptions because Lambert refused the City's proposed continuance for an 11th-hour deposition.

Specifically, one of the topics Lambert wanted to explain in his testimony was his reason for starting the dispensary, presumably to show that it was for a non-profit purpose as required by state medical marijuana law. Lambert complained the City "is saying that why Mr. Lambert started the collective . . . is irrelevant. Well, it is not irrelevant at all. The allegation is that he started this as a money-making scheme to — to use the auspices of medical marijuana to make a fortune for himself. So his intent is very relevant in this case." As a related matter, Lambert sought to testify concerning his

17

current financial condition: "he just is now, he and his family are being evicted from their home. If he were making the millions of dollars, it is certainly a reasonable assumption that he would have used some of those millions."

Lambert points to the *deposition testimony* of the dispensary operator in *Holistic Health*, who emphasized, "'I want it noted how much money we lost last year,'" and explained "his dire financial predicament reflected that Holistic Health was not profitable: 'My house has been foreclosed on. My boat was repossessed. My motorcycles have been repossessed,' and he expressed frustration at the notion 'that I'm getting rich when all my stuff is being taken and my credit has been ruined over this whole thing.'" (*Holistic Health*, *supra*, 213 Cal.App.4th at p. 1027.) We explained the trial court in *Holistic Health* could not summarily exclude this testimony under Evidence Code section 352 at summary judgment after denying the city's protective order because it "was tailored precisely to the dispositive issue of profit. Accordingly, the time necessary for the court to consider the evidence can in no way be characterized as 'undue.'" (*Id.* at p. 1029.)

Here, the trial court in its in limine ruling relied on Evidence Code section 352 to exclude Lambert's proposed testimony about why he started the dispensary and his current financial condition. But in its statement of decision, the trial court properly explained it excluded Lambert's proffered evidence because "the defendant's tactics of producing [evidence] at the last instance prior to trial deprived the plaintiff of the ability to conduct discovery . . . , including verifying the authenticity of the documents, asking follow up questions to the deponents . . . etc." Unlike *Holistic Health*, where the dispensary operator complained about his financial condition at his deposition well before trial, and therefore the city could follow up with further questions and

18

discovery to verify his testimony, here Lambert sought at trial to spring on the City his financial condition and reasons for starting the dispensary.  We note Lambert's proposed testimony was similar in substance to the topics on which the City had sought to depose him and had propounded discovery requests, i.e., Lambert's compensation and the dispensary's organization and operation, including its finances and whether it operated as a nonprofit.  Additionally, Lambert refused the City's suggestion for a pretrial deposition to "find out what they're going to say."  Given these considerations, the trial court did not err in excluding Lambert's proposed testimony.

A second category in Lambert's offer of proof that the trial court rejected concerned document shredding.  Lambert admitted at his deposition that BCC shredded patient records and other documents. At trial, Lambert sought to testify that he did so upon the recommendation of his data security consultant, after the records were scanned and preserved electronically, and he sought to have the consultant testify.  The trial court acknowledged the consultant's proffered testimony was to "rebut the contention by the City that the defendant was shredding documents to destroy relevant evidence showing that BCC was a for profit enterprise."   The consultant, Mr. Ewar, was a dispensary member and BCC had refused to disclose its member lists based on federal privacy provisions in the Health Insurance Portability and Accountability Act (HIPAA).  The trial court excluded Ewar's testimony because "the defendants had objected to providing the City a record of its membership on HIPAA grounds and the late disclosure of Mr. Ewar as a member and witness was not justified."

We agree with Lambert the fact Ewar had not been disclosed as a dispensary member was of minimal relevance because his patient status had little pertinence to his testimony.  Moreover, if the trial court believed Ewar's member status

19

was crucial to evaluating his credibility, a patient can volunteer his or her own medical information without violating HIPAA, even if Lambert could not.  But the trial court properly excluded Ewar based on Lambert's late disclosure of him as a witness.  (See *Grupe Co. v. Workers' Comp. Appeals Bd.* (2005) 132 Cal.App.4th 977, 988 ["If a party fails to disclose the identity of a witness or an exhibit in the pretrial conference statement, such evidence is inadmissible"].)  This is particularly true given Lambert refused the City's offer of a continuance for pretrial depositions of belated witnesses "to find out what they're going to say."  Lambert could not in fairness oppose disclosure of potential witnesses during discovery, but later have a new witness testify at trial.

We also note that while Lambert suggests he only shredded documents on his consultant's recommendation "*after the records were scanned and preserved electronically*,"  he made no effort to provide those documents in electronic format or hard copies in response to the City's numerous discovery requests.  Lambert also rejected the City's offer of a pretrial continuance to examine potential new evidence.  Nor did Lambert include the purportedly preserved documents in the exhibit binders that must be exchanged before trial under the superior court's local rules.  Effectively, then, the documents did not exist.

The trial court explained in its statement of decision that it made "no finding of intentional destruction for the purposes of avoiding adverse evidence.  However, it is clear that relevant evidence was destroyed, and that this was the best evidence to demonstrate the financial condition of the defendant's operation relating to its compliance with the CUA, MMPA, and AG Guidelines.  As such, the court may presume that such evidence would have been unfavorable to the defendant's case."  The trial court's comments appear contradictory in both suggesting a presumption undisclosed

20

evidence may have been unfavorable but also that it was not willfully suppressed or intentionally destroyed for an improper purpose.

But we find no error because the court's comments boiled down to the simple and correct observation that Lambert failed to produce the dispensary's records, whether in electronic or original form, and instead offered only his limited explanation at his deposition of the dispensary's operations. The trial court reasonably could take a jaundiced view of such testimony without the support of the underlying documents. (Evid. Code, § 412 ["If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust"].) In sum, Lambert's challenges concerning exclusion of evidence and the manner in which the trial court weighed his evidence are without merit.

C.    *The City's Expert*

Lambert challenges the trial court's decision to admit the testimony of Orange County Sheriff's Department Sergeant Thomas Lambi, who investigated BCC and numerous other medical marijuana dispensaries. The City designated Lambi as a percipient expert witness before trial. As the City explained in its designation, "While not formally retained as an expert witness, [Lambi] may have percipient knowledge and may provide testimony concerning the relevant medical marijuana laws . . . and Defendants' compliance with (or lack thereof) that could fairly be characterized as 'expert testimony,' and therefore, in the interests of full disclosure and out of an abundance of caution, the City designates this individual as an 'expert witness' although not formally retained by it in this case."

21

Lambert contends the trial court erred in permitting Lambi to offer "unqualified" and "speculative" expert testimony. Lambert also argues the trial court erred in denying his request for a hearing under *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) to challenge the reliability of Lambi's testimony. Specifically, Lambert claimed Lambi's method of estimating dispensary revenue and profits implicated *Kelly* because it amounted to a new, pseudoscientific technique. As we explain, Lambert's challenges are misplaced and furnish no basis for reversal.

In asserting Lambi's testimony was unqualified and speculative, Lambert does not attack Lambi's general expertise concerning medical marijuana dispensaries based on his numerous local investigations. Instead, Lambert challenges the evidentiary foundation for Lambi's opinions concerning *BCC*'s revenues and profitability. He argues the trial court "abdicated its gatekeeping responsibility by admitting unsupported and speculative expert testimony." Lambert relies on the rule stated in *Pacifica Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135: "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value." As our Supreme Court has explained, the trial court "acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 771-772.)

Lambert repeatedly challenged the foundation for Lambi's testimony. For example, he asserted a general treatise Lambi cited concerning marijuana cultivation was

22

of no value because the author grew his marijuana in the Netherlands, and did not account for costs such as electricity and water. According to Lambert, Lambi's cost estimates for growing or obtaining marijuana locally failed to include overhead expenses such as initial equipment, rent, labor, legal costs, insurance, replacement equipment, and an alarm system.

Lambert also attacked as unfounded Lambi's estimate that BCC garnered as much as $10,000 a day based on up to 100 daily marijuana sales transactions at an average of $100 each. Lambert calculated this figure based in part on observations made by the City's manager and assistant manager outside BCC's storefront location, counting customer traffic in and out of the store in 15- to 60-minute intervals. Additionally, an undercover officer purchased $20 worth of marijuana at BCC to establish it was engaged in marijuana distribution.

But Lambert argues the $20 transaction actually *undercuts* Lambi's revenue estimates because it "is a mathematical non sequitur" to infer a $100 average purchase price from that figure. He complains Lambi did not account for possible bias in the city managers' customer counts, nor their unreliably brief sample intervals. Lambert notes Lambi had "no expertise in mathematical modeling," he "never tested the reliability of his estimates," nor "established an error rate for his model," nor an error rate for "his statistical conclusion that dispensaries average 100 patients per day." Consequently, Lambert contends Lambi's "method is scientifically invalid and not the type of information experts typically rely on," and therefore the trial court erred by denying his motions to strike Lambi's testimony.

Lambert's challenges are misplaced, however, for three reasons. First, we observed in *Beach Cities II* that it was BCC's obligation to establish as an affirmative

23

defense that its admitted marijuana sales transactions were lawful, including that it did not turn a profit. (*Beach Cities II*, *supra*, at p. 16; see § 11362.765, subd. (a) ["nothing in this section shall authorize . . . any individual or group to cultivate or distribute marijuana for profit"].) As we noted in *Beach Cities II*, the Supreme Court explained in *Mower*, *supra*, 28 Cal.4th at p. 477 that "the 'burden of proving an exonerating fact may be imposed on a defendant if its existence is "peculiarly" within his personal knowledge and proof of its nonexistence by the prosecution would be relatively difficult or inconvenient.'" The high court concluded this rule was particularly apt in the medical marijuana context where state law provides an exemption from otherwise generally applicable criminal laws barring marijuana distribution. (*Ibid.*)

In *Beach Cities II*, the limited evidence BCC presented concerning the nonprofit nature of its operations was enough for the dispensary to survive the City's summary judgment motion. But the trial court was not required to credit that evidence at trial, nor the scant additional evidence BCC introduced. Indeed, the trial court as the trier of fact reasonably could conclude that BCC's failure to produce its books or other direct evidence of its costs, expenses, profits, or manner of operation was fatal to its affirmative defense that it operated as a nonprofit entity and that it complied in all respects with state medical marijuana law, including lawfully growing its marijuana. Consequently, given BCC's failure to support its affirmative defense at trial, Lambi's revenue and profit calculations were not essential to the trial court's conclusion BCC operated unlawfully. Any potential flaws in Lambi's testimony therefore do not require reversal of the judgment.

Second and related, the trial court did not rely on Lambi's calculation of $10,000 in daily proceeds from BCC's illegal marijuana sales. Indeed, the trial court

24

expressly noted "the evidence supporting the assertion of 100 customers a day was rather weak . . . ." The trial court instead imposed a lower civil penalty of $500 a day for each day BCC unlawfully operated its business enterprise, and ample evidence supported that figure, which Lambert does not challenge. In particular, nothing suggested BCC was an atypical dispensary, and therefore the trial court reasonably could infer at least $500 in daily marijuana sales from Lambi's uncontroverted testimony based on his experience investigating local dispensaries and the market for medical marijuana, including their online published price lists. In any event, the trial court's authority to impose the penalty is not based on net or gross proceeds from an unlawful venture, but instead on factors including the willfulness and persistence of the misconduct and the harm to the community and businesses operating lawfully. (Bus. & Prof. Code, § 17206, subds. (a) & (b); see *People ex rel. Lockyer v. Brar* (2005) 134 Cal.App.4th 659, 668 [upholding fine of $1,000 for each "shakedown" letter attorney sent nail salons he alleged were operating illegally].) Accordingly, Lambert's attack on the allegedly unscientific nature of Lambi's testimony furnishes no grounds for reversal.

Finally, Lambert's reliance on *Kelly* is misplaced. He was not entitled to a hearing under *Kelly* to challenge Lambi's method of estimating dispensary revenue and profits as a new, untested, and pseudoscientific technique. (See generally *Kelly*, *supra*, 17 Cal.3d 24.) There was nothing novel or revolutionary in Lambi's attempt to gauge BCC's financial position in the local medical marijuana market. He simply estimated dispensary costs and profit based on likely expenses, product pricing, and sales volume, absent BCC's cooperation but in accord with prevailing local market conditions that he knew well. Lambert's challenges went to the weight, not the admissibility of Lambi's

25

testimony, and consequently the trial court did not err in denying Lambert's motions to exclude or strike the evidence.

Lambert also argues in his reply brief that the trial court erred in allowing Lambi to testify as an expert witness when the City had not designated him as a *retained* expert witness. The argument is forfeited by Lambert's failure to raise it in his opening brief and, in any event, has no merit. Lambert relies on the distinction the Supreme Court has drawn in the medical context between "retained" and "percipient" experts. (*Schreiber v. Estate of Kiser* (1999) 22 Cal.4th 31, 34-35.) A "retained" expert is a witness a party employs "'for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for trial,'" while a "percipient" expert "acquires his information independently of the party that expects to be calling him" (*id.* at p. 35). The City explained Lambi did not conduct his investigation or form any opinions at the City's behest, but instead "any opinion Sergeant Lambi formed about Defendants' operations was part of his regular duties as an investigating officer." The trial court reasonably admitted Lambi's testimony as a percipient expert. Moreover, given the City expressly notified Lambert in its expert witness designation that it intended to call Lambi as an expert, there is no conceivable harm in the trial court's ruling.

D.      *Lambert's Standing to Challenge the City's Ban on Dispensaries*

Lambert also contends the trial court erred in dismissing his cross-complaint challenging the City's ban on dispensaries. The trial court concluded Lambert lacked standing to contend state law preempted the City's ban. The trial court relied on our opinion *Traudt v. City of Dana Point* (2011) 199 Cal.App.4th 886, review granted Jan. 18, 2012, S197700, rev. dism. Mar. 14, 2012.) There, we concluded "an individual medical marijuana patient is not the proper party to challenge generally applicable zoning

26

provisions because—whatever the contours of the right to engage in cooperative or collective medical marijuana activity (see, e.g., § 11362.775)—the Legislature invested this right in cooperative and collective groups and entities, not in individuals."

Lambert argues that because he was not merely a member, but also the founder and an owner of the dispensary, he had standing to challenge the City's ban. Even assuming that is true, however, the point is moot in light of the Supreme Court's decision in *Inland Empire* upholding local bans. Additionally, the trial court's injunction and imposition of fines and penalties under Business & Professions Code section 17206 was not based solely on BCC's unlawful conduct in violating *the City's ban* on dispensaries (third cause of action), but rather because of BCC's violation of state medical marijuana law. Accordingly, BCC violated the narcotics abatement law (§ 11570) as alleged in the City's first cause of action, and therefore constituted a public nuisance (second cause of action), and was subject to the fines and penalties under 17200 (fourth cause of action).

III

DISPOSITION

The judgment is affirmed.  The City is entitled to its costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


FYBEL, J.